J-A22024-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: G.M.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 548 MDA 2020 |

Appeal from the Order Entered February 21, 2020
In the Court of Common Pleas of Columbia County Juvenile Division at
No(s):  206-OC-2018,
207-OC-2018, CP-19-DP-0000015-2016,
CP-19-DP-0000016-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: H.R.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 549 MDA 2020 |

Appeal from the Order Entered February 21, 2020
In the Court of Common Pleas of Columbia County Juvenile Division at
No(s):  CP-19-DP-0000016-2016

| | | |
|---|---|---|
| IN RE: H.R.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.B..MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 550 MDA 2020 |

Appeal from the Order Entered February 21, 2020
In the Court of Common Pleas of Columbia County Orphans' Court at
No(s):  207-OC-2018

IN RE: G.M.S., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
APPEAL OF: K.B., MOTHER :
:
:
:
:
:
:
: No. 551 MDA 2020

Appeal from the Order Entered February 21, 2020
In the Court of Common Pleas of Columbia County Orphans' Court at
No(s): 206-OC-2018

BEFORE: SHOGAN, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY SHOGAN, J.: **FILED OCTOBER 26, 2020**

K.B. ("Mother") appeals from the orders entered on February 21, 2020, that involuntarily terminated her parental rights and changed the permanency goals from reunification to adoption with respect to her daughters, G.M.S., born in March of 2014, and H.R.S., born in April of 2015 (collectively, "the Children").[1] After careful review, we affirm.

We summarize the relevant facts and procedural history as follows. In July of 2015, Columbia County Children and Youth Services ("CYS" or "the Agency") initiated services for this family due to concerns regarding substance abuse, housing instability, and the parenting skills of Mother and Father. N.T.,

_____

[1] By the same orders, the court involuntarily terminated the parental rights of M.S. ("Father"). Father timely filed notices of appeal, which we address by separate memorandum.

- 2 -

12/4/19, at 10-11. On November 17, 2015, Mother and Father were incarcerated on charges involving the possession of methamphetamine. *Id.* at 13, 57, 114; CYS Exhibits 11, 13. Mother remained incarcerated until February 4, 2016, when she was released on bail.[2] CYS Exhibit 11.

Due to Mother's and Father's incarceration and substance abuse, CYS filed dependency petitions in March of 2016. N.T., 12/4/19, at 14. The juvenile court adjudicated the Children dependent on April 6, 2016, and placed them in foster care. *Id.*; Findings of Fact, Conclusions of Law and Order, 2/21/20, at 2, ¶ 5. The court established reunification as the Children's permanency goal. N.T., 12/4/19, at 19. In furtherance of that goal, Mother and Father were required to participate in drug and alcohol evaluations and follow all recommendations, as well as submit to random drug screens and refrain from illegal drug use. *Id.* at 17. Mother and Father also were required, *inter alia*, to complete parenting classes and demonstrate an increase in parenting skills and knowledge. *Id.* at 18.

On March 6, 2017, Mother pleaded guilty to institutional vandalism, 18 Pa.C.S. § 3307(a)(3). CYS Exhibit 11. Mother was sentenced to twelve months of probation, with credit given for the days previously served in prison. *Id.* Because Mother violated her probation by failing to maintain contact with

_____

[2] There is no record evidence that the Children were placed in the legal and/or physical custody of CYS during Mother's imprisonment. Rather, as discussed *infra*, the record indicates that the Children were placed after being adjudicated dependent.

the adult probation office, she was re-incarcerated on September 25, 2017. N.T., 12/4/19, at 45–46. Mother was re-sentenced to a period of incarceration of not less than five months nor more than twelve months, with credit given for the days previously served in prison. CYS Exhibit 11. The court directed that Mother be automatically paroled at the end of her minimum sentence and remain under the supervision of adult probation for the balance of her maximum sentence. *Id.* The court further directed that Mother shall have special parole conditions, including an approved home plan, and that she participate in a drug and alcohol evaluation and follow all treatment recommendations. *Id.* On May 18, 2018, Mother was released from prison to Graniteville House of Recovery ("Graniteville"), where she remained until July of 2018. N.T., 12/4/19, at 46.

Both before and after Mother's stay at Graniteville, she failed to complete an outpatient drug and alcohol treatment program. Findings of Fact, Conclusions of Law and Order, 2/21/20, at 3, ¶ 21; N.T., 12/4/19, at 26–31; N.T., 1/8/20, at 39–40. Throughout the history of this case, Mother relocated multiple times, and she failed to maintain consistent contact and promptly advise CYS of her new addresses. N.T., 12/4/19, at 31, 57–69, 113. As a result, CYS was able to conduct only nine random drug screens prior to filing the subject petitions. In 2015, Mother tested positive for amphetamines, methamphetamine, and marijuana. CYS Exhibit 8. Mother tested positive for marijuana in April of 2016 and in February, May, and September of 2017. *Id.*

In 2018, CYS did not conduct random drug screens because Mother was incarcerated or in Graniteville until July of that year. CYS Exhibit 8; N.T., 12/4/19, at 45–46. Thereafter, from July through the end of December of 2018, Mother moved on three occasions, and CYS had difficulty locating her. N.T., 12/4/19, at 67–71.

On November 2, 2018, CYS filed petitions for a goal change to adoption and petitions for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (5), (8), and (b). A hearing on CYS's petitions occurred on December 4, 2019, and January 8, 2020.[3] CYS

---

[3] During the hearing, an attorney-guardian *ad litem* (GAL) represented the legal and best interests of the Children, then four and five years old. However, the orphans' court had appointed separate counsel to represent the Children's legal interests. The GAL stated on the record in open court that legal counsel had previously informed the court that there was no conflict between the Children's legal and best interests. N.T., 12/4/19, at 2-6. Therefore, the Children's legal counsel did not represent the Children at the hearing.

We conclude that the court complied with **In re Adoption of L.B.M.**, 161 A.3d 172 (Pa. 2017), which held that, pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary-termination proceeding has a statutory right to counsel, who discerns and advocates for the child's legal interests and which the Court defined as a child's preferred outcome. **L.B.M.**, 161 A.3d at 180. In addition, the court complied with **In re T.S.**, 192 A.3d 1080 (Pa. 2018), which held that, in cases where there is no conflict between a child's legal and best interests, a GAL "representing the child's best interests can also represent the child's legal interests. . . ." **Id.** at 1092; **see also In re Adoption of K.M.G.**, 219 A.3d 662, 670 (Pa. Super. 2019) (*en banc*) (citation omitted), *appeal granted in part*, 221 A.3d 649 (Pa. 2019) (holding that this Court:

does **not** have the authority [to] review *sua sponte* whether a conflict existed between counsel's representation and the child's

presented the testimony of the Children's caseworker, Brittany Hacker, and Mother testified on her own behalf.

By orders dated and entered on February 21, 2020, the orphans' court involuntarily terminated Mother's parental rights and changed the Children's permanency goals to adoption.[4]  Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*.  The orphans' court filed a Rule 1925(a) opinion on April 1, 2020.

On appeal, Mother presents the following issues, which we have re-ordered for ease of disposition:

I. Did the [orphans'] court abuse its discretion and misapply the law when it granted the Agency's Petition to Terminate Mother's Parental Rights under 23 Pa.C.S.A.  § 2511(a)(1), (5), (8), and § 2511(b)?

II. Did the [orphans'] court abuse its discretion and misapply the law when it granted the Agency's Petition for Goal Change to Adoption, where the Agency failed to satisfy its burden by clear and convincing evidence that the goal change was in the Children's best interest?

---

stated preference in an involuntary termination of parental rights proceeding.  Rather, . . . this Court's authority is limited to raising sua sponte the issue of whether the orphans' court violated Section 2313(a) by failing to appoint **any** counsel for the [c]hild in a termination hearing.).

(emphases in original).

[4] The GAL stated on the record in open court that it is in the Children's best interests that Mother's parental rights be terminated and their goals be changed to adoption.  N.T., 12/4/19, at 6.

Mother's Brief at 5.

We review Mother's first issue for an abuse of discretion, as follows:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

The relevant provisions of Section 2511 in this case are as follows:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any

- 8 -

efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (5), (8), and (b).

We review the termination orders pursuant to Section 2511(a)(8). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that, this Court need only agree with any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights).[5]

This Court has explained, "Section 2511(a)(8) sets a [twelve]-month time frame for a parent to remedy the conditions that led to the children's removal by the court." **In re A.R.**, 837 A.2d 560, 564 (Pa. Super. 2003). Once the twelve-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good-faith efforts of the child welfare agency supplied over a realistic time period. **Id.** The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." **In re I.J.**, 972 A.2d 5, 11 (Pa. Super. 2009). Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement

---

[5] Based on this disposition, we need not review Mother's arguments regarding Sections 2511(a)(1) and (5).

or the availability or efficacy of the agency's services. *In Re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003).

Finally, the court must consider whether termination of parental rights would best serve the needs and welfare of the child. *In re Adoption of M.E.P.*, 825 A.2d at 1275–1276. The "needs and welfare" analysis is relevant to both Sections 2511(a)(8) and (b). In *In re Adoption of C.L.G.*, 956 A.2d 999 (Pa. Super. 2008) (*en banc*), this Court stated:

> [W]hile both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of C.L.G., as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*Id.* at 1009 (citations omitted).

With respect to Section 2511(b), we have explained, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762–763 (Pa. Super. 2008) (citation omitted).

- 10 -

Mother argues that CYS failed to meet its burden of proof with respect to the second element of Section 2511(a)(8), *i.e.*, that the conditions which led to the removal or placement of the Children continue to exist. Mother's Brief at 25. Mother contends that she satisfied the objectives of the Children's permanency plans. Specifically, Mother asserts that she completed a drug and alcohol evaluation, parenting classes, and that she found stable housing. *Id.* We disagree.

Ms. Hacker, the Children's caseworker, testified that Mother informed her in September of 2016, that she completed a drug and alcohol evaluation. N.T., 12/4/19, at 24. In addition, Ms. Hacker testified that Mother told her in April of 2017 that "she completed an intake at Gaudenzia," a drug and alcohol rebilitation facility, . . . "and was going to be admitted to outpatient drug and alcohol counseling" there. *Id.* at 25. Ms. Hacker learned that Mother completed one session at Gaudenzia in May of 2017, but she never returned. *Id.* Thereafter, while Mother was in Graniteville from May until July of 2018, Ms. Hacker testified that Mother participated in treatment at Northeast Counseling. *Id.* at 29. However, there is no record evidence that Mother completed that treatment. *Id.* at 29–30.

During her cross-examination by CYS, Mother testified with respect to the drug and alcohol treatment she received after she left Graniteville:

Q. After you left [Graniteville,] do you know if you attended Genesis House?

A. Yes, I went to two of them but then I had to move so I had to quit going to them.

Q. Would you agree with me you never completed any outpatient treatment at Genesis House?

A. Yes.

Q. Did you do any other outpatient treatment for drug use after leaving the Graniteville House of Recovery?

A. I did start going to R.U. Reformers Anonymous.

* * *

Up in Berwick. But, unfortunately, because of me hopping around like I was, I wasn't able to get up there either.

N.T., 1/8/20, at 39–40. Based on the foregoing testimony of Ms. Hacker and Mother, it is clear that Mother completed at least one drug and alcohol evaluation, but she never completed any treatment program.

Moreover, Mother did not overcome her addiction to illegal drugs by the time of the subject proceeding. Ms. Hacker testified that on August 16, 2019, Mother left her a voicemail stating that she was hospitalized for multiple injuries.[6] N.T., 12/4/19, at 78. On cross-examination by CYS, Mother

_____

[6] Ms. Hacker learned that Mother allegedly was assaulted by her ex-paramour, and that she sustained a brain hemorrhage. N.T., 12/4/19, at 78–79. On cross-examination by CYS, Mother testified that while camping with her ex-paramour, her ex-paramour "beat me up and ran me over several times with a four wheeler as well as I was being forced to walk around on it, and I got my head smacked off of a rock and ended up hemorrhaging in my head." N.T., 1/8/20, at 35–36.

- 12 -

acknowledged that upon admission to the hospital at that time, she was screened for drugs and found positive for methamphetamine and marijuana. N.T., 1/8/20, at 37–38. On March 26, 2019, CYS performed a random drug screen on Mother, in which she tested positive for marijuana. CYS Exhibit at 8. On November 25, 2019, approximately one week prior to the commencement of the subject proceeding, Ms. Hacker made an unannounced visit to Mother's home to perform a random drug screen, but Mother did not answer the door. *Id.*; N.T., 12/4/19, at 34. Ms. Hacker testified that she left a note for Mother "to come into the Agency within 24 hours with a date November 26th by 12:45. And Mom did not come in to the Agency to submit a drug screen." N.T., 12/4/19, at 34. Finally, Mother testified on cross-examination by CYS with respect to her drug addiction, as follows:

> Q. Would you agree with me that after you completed rehab at Graniteville you tested positive for methamphetamine at the hospital, and marijuana, last summer, . . . .? That you still haven't maintained staying drug-free?
>
> A. Not completely.
>
> Q. Would you agree that is one of the things the Agency wanted you to do to get your kids back?
>
> A. Yes.

---

Ms. Hacker testified that Mother was discharged from the hospital to a rehabilitation center on September 3, 2019, where she remained for approximately one week. N.T., 12/4/19, at 80.

*Id.* at 40–41. Thus, Mother failed to satisfy her permanency objective regarding illegal drugs.

With respect to her parenting objective, Ms. Hacker testified that Mother "attended minimal parenting classes." N.T., 12/4/19, at 42. Specifically, she testified on direct examination:

Q. Do you know when [Mother] first began to attend any parenting classes?

A. In June of 2017 it was reported that Mother initially met with a worker from the Columbia County Family Center in regard to parenting classes. But at that point Mom didn't follow through with services. And then Mother attended a parent class on August 17th of 2017 and September 21st of 2017.

Q. Do you know if she actually finished the course of parenting classes requested by the Agency?

A. She did not finish all ten classes, no.

*Id.* at 42–43. Ms. Hacker testified that while incarcerated, Mother attended an "intake" appointment for parenting classes on March 26, 2018, and she participated in four classes while incarcerated. *Id.* at 43–44. In addition, while residing in the Graniteville, Mother attended an intake appointment for parenting classes on May 25, 2018, at "Bridges in Luzerne County." *Id.* at 46. Ms. Hacker testified, "[Bridges] did report that Mom attended the intake[,] and Mother attended a couple classes before being discharged from Graniteville House of Recovery." *Id.* at 46–47. Ms. Hacker testified that Mother did not advise that she attended any other parenting classes during the Children's dependencies. *Id.* at 48. On cross-examination by Mother's

counsel, Ms. Hacker testified that Mother never completed the requisite ten parenting classes. N.T., 1/8/20, at 8–9.

With respect to visitation, Mother testified on cross-examination by CYS:

Q. Would you agree that you have not maintained consistent regular visits with the [Children] since they have been placed in foster care?

A. Right.

Q. Why not?

A. Stuff would come up[,] and I would not be able to make it.

N.T., 1/8/20, at 51. In 2016, CYS scheduled a total of eleven visits between Mother and the Children, and Mother attended four. CYS Exhibit 15. In 2017, CYS scheduled twenty-five visits, and Mother attended seventeen, four of which occurred while she was incarcerated. *Id.* In 2018, CYS scheduled twenty visits, and Mother attended sixteen, eight of which occurred while she was incarcerated. *Id.* In 2019, CYS scheduled twenty-one visits, and Mother attended four. *Id.* On re-direct examination by CYS, Ms. Hacker testified that Mother has seen the Children a total of five hours in 2019. N.T., 1/8/20, at 18.

In summary, Ms. Hacker testified on direct examination:

Q. Have the parents met the minimum standards required in the Agency's view for reunification with the [C]hildren?

A. No.

Q. When you say "no," what is that based on?

A. It is based on the fact that parents have not completed all objectives and tasks identified in the permanency plan. Although they have made efforts to do so on some occasions over the past three years or so, none of the objectives or tasks have been fully completed which would allow for reunification.

Q. Do you believe at this point in time that the parents have stable housing?

A. No.

Q. Why do you believe they don't?

A. [Mother] has reported that she is residing at [an address in Wapwallopen[7]] but during my unannounced visit nobody answered. I'm also not able to confirm that that is an appropriate or stable house for [Mother].[8]

Q. Do you believe Mom has had a history of bouncing from various houses while you have had the case?

A. Yes.

Q. Is that a concern for the Agency?

A. It is a concern, yes.

Q. Does the Agency believe that Mother is able to meet the [C]hild[ren]'s basic needs?

A. No.

N.T., 12/4/19, at 100–101.

_____

[7] Mother later testified that the address Ms. Hacker identified on December 4, 2019, was located in Wapwallopen, Pennsylvania. N.T., 1/8/20, at 32.

[8] Mother testified on cross-examination by CYS that she has resided at her current address with her boyfriend since June of 2019. N.T., 1/8/20, at 33. Mother testified that her boyfriend pays her living expenses. *Id.* at 42.

Based on the foregoing testimonial evidence, we reject Mother's argument that the orphans' court abused its discretion with respect to the second element of Section 2511(a)(8), that the conditions that led to the Children's removal continue to exist. The record evidence demonstrates that Mother's illegal drug addiction, insufficient parenting, and housing instability continue to exist. Therefore, at the time of the subject proceeding, reunification of Mother and the Children was not imminent. *In re I.J.*, 972 A.2d at 11.

We also review whether the record supports the court's finding regarding the third element of Section 2511(a)(8): that termination of Mother's parental rights would best serve the needs and welfare of the Children. *In re Adoption of C.L.G.*, 956 A.2d at 1009. The record supports the court's finding insofar as the Children have been in placement since April of 2016, which amounted to three years, nine months by the conclusion of the subject proceeding. As discussed above, the conditions which led to the Children's placement continue to exist, and reunification of Mother and the Children was not imminent. Ms. Hacker testified on direct examination as follows:

> Q. One of the objectives of the child permanency plans was assurance of the child's safety. Do you think that the [C]hildren's safety could be assured if they were returned to their parents?
>
> A. No.
>
> Q. Specifically why is that?

A. I think that it would be a concern if they continued to bounce around home to home, . . ., if parents are continuing to use [illegal drugs], I don't believe that the [C]hildren's safety would [be] assured.

N.T., 12/4/19, at 104.

In addition, the record indicates that although the Children may love Mother, they also love their foster mother, with whom they have resided, along with their foster father, since December of 2016. N.T., 12/4/19, at 107–108. On cross-examination by Mother's counsel, Ms. Hacker testified:

Q. When [Mother] would show up to the visitation would you agree she was appropriate with the girls?

A. Yes.

Q. They had a good time together?

A. Yes.

Q. They would call her Mom?

A. They would, yes.

Q. You agree with me that the girls love her?

A. I would agree that their actions during visitations may show that.

Q. You agree with that?

A. Yes.

N.T., 1/8/20, at 12–13.

With respect to whether the Children love their foster mother, Ms. Hacker, who observed the Children monthly in their foster home, testified, "Yes, absolutely. There are plenty of times I am there and [H.R.S.] and

- 18 -

[G.M.S.] are running up to [their foster mother] and giving hugs and saying[,] 'I love you, Mommy.'" N.T., 12/4/19, at 107, 112. Moreover, on re-direct examination by CYS, Ms. Hacker testified that she believes it would be in the best interests of the Children to be adopted by their foster parents. *Id.* at 111. She explained:

> [The Children] have been there the past three years. They are bonded with the foster family. [T]hey have grown within that home and with the foster family. Their needs are being met. [G.M.S.] is in school. She seems to be doing well. [The foster mother] ensures they go to every medical appointment and they have everything they need.

*Id.* at 111–112.

Based on the totality of the record evidence, we discern no abuse of discretion by the orphans' court in terminating Mother's parental rights pursuant to Section 2511(a)(8). The record clearly demonstrates that the Children have been removed from Mother's care far in excess of the statutory twelve-month minimum; the conditions which led to their removal continue to exist, and terminating Mother's parental rights would best serve the needs and welfare of the Children. Mother's issue regarding Section 2511(a)(8) fails.

With respect to Section 2511(b), Mother argues that the court abused its discretion because it is not in the Children's best interest to terminate her parental rights. Specifically, Mother argues that insofar as Ms. Hacker testified that the Children love Mother, the court "provided little to no consideration [of] the bond between the Children and Mother." Mother's Brief at 27. We disagree.

The following case law is relevant:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533–536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Furthermore, our Supreme Court has stated, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "Children are young for a scant number of years, and we have an

obligation to see to their healthy development quickly. When courts fail[,] . . . the result, all too often, is catastrophically maladjusted children." *Id.*

We discern no abuse of discretion by the orphans' court in concluding that terminating Mother's parental rights serves the developmental, physical, and emotional needs and welfare of the Children. We reject Mother's assertion that the court failed to adequately consider the bond between her and the Children insofar as the record is devoid of any evidence that a beneficial bond exists between them. *See In re K.Z.S.*, 946 A.2d at 763 (citation omitted) (providing that the extent of any bond analysis "depends on the circumstances of the particular case.").

We also emphasize the court's finding that CYS Exhibit 15 "shows a lack of consistency in Mother's visitations with the Children and demonstrates that such visitations have been sporadic and inconsistent. This inconsistency is not only not in the best interest of the Children, but it is emotionally injurious to them." Findings of Fact, Conclusions of Law and Order, 2/21/20, at 4, ¶ 41. The documentary and testimonial evidence supports this finding. Mother acknowledged that she has not maintained consistent visitation with the Children since they have been placed in foster care. N.T., 1/8/20, at 51. Ms. Hacker testified as follows on cross-examination by the GAL with respect to the effect on the Children when Mother or Father did not appear for visitations:

Q. Are you present with the [C]hildren when the parents don't appear?

A. Typically, yes.

Q. To your knowledge, how did the [C]hildren act out or react?

A. They do, actually. They have had meltdowns because they are anticipating to go in and have an hour to spend with them and play. I have to go out and tell foster [m]om and [d]ad they're not coming and the visit is canceled. And foster [m]om will tell the girls "come on we have to go." And it is just a meltdown. Sometimes they are on the floor kicking, screaming not wanting to leave.

Q. It is not a pretty scene?

A. No, it is not.

Q. Have you ever, you personally, told the parents "look you can't schedule these visits and then not show?"

A. That is why we made the rule of them confirming for the visits because prior to confirmation parents were scheduled and they were not showing up. So they were made to confirm. There only has been a couple visits I believe since putting that in place that parents had confirmed and not shown up. . . .

N.T., 1/8/20, at 14–15. Based on the foregoing, Mother's argument regarding Section 2511(b) fails.

We now turn to Mother's argument that the court abused its discretion in changing the Children's permanency goals from reunification to adoption. Mother asserts she "was ready and willing to provide the Children with a stable home. She had satisfied the majority of the goals the Agency required of her. Additionally, her bond with her Children is strong." Mother's Brief at 19. Further, Mother contends that the court's "consideration regarding the bond between Mother in the Children was, for the most part, not existent, and

therefore, inadequate to determine whether a goal change was appropriate and in the best interest of the Children." *Id.* We disagree.

We review this issue for an abuse of discretion. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). Section 6351(f) of the Juvenile Act, 42 Pa.C.S. § 6301, *et seq.*, provides, in relevant part, as follows:

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

* * *

(9) If the child has been in placement for at least 15 of the last 22 months . . . whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child . . . .

- 23 -

42 Pa.C.S. § 6351(f)(1)–(6), (9). "These statutory mandates clearly place the trial court's focus on the best interests of the child." *In re S.B.*, 943 A.2d 973 978 (Pa. Super. 2008) (citation omitted). "Safety, permanency, and well-being of the child must take precedence over **all** other considerations." *Id.* (citation omitted) (emphasis in original). Moreover, the burden is on the child welfare agency "to prove the change in goal would be in the child's best interest." *In re D.P.*, 972 A.2d 1221, 1227 (Pa. Super. 2009).

Mother's assertions are belied by the record. With regard to whether Mother was ready and willing to provide the Children with a stable home, Ms. Hacker testified that she was unable to confirm whether Mother's current housing is appropriate or stable. N.T., 12/4/19, at 100–101. Likewise, Ms. Hacker's testimony directly contradicts Mother's assertion that she satisfied the majority of her permanency goals. Ms. Hacker testified that "none of the objectives or tasks have been fully completed which would allow for reunification." *Id.* at 100. Finally, contrary to Mother's assertion, there is no record evidence that a strong bond exists between her and the Children. Rather, Ms. Hacker's testimony demonstrates that a strong bond exists between the Children and their foster parents. N.T., 12/4/19, at 111–112. Because the evidence supports the court's decision to change the Children's permanency goals to adoption, Mother's issue fails. Accordingly, we affirm the orders granting CYS's petitions to involuntarily terminate Mother's parental rights and to change the Children's permanency goals to adoption.

Orders affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>10/26/2020</u>